# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERESA RICHARDSON; CHRISTOPHER CARROLL; GINA ARFI; and AIDA ZYGAS,<br><br>                    Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; LOUIS DEJOY, in his official capacity as Postmaster General of the United States; and UNITED STATES POSTAL SERVICE,<br><br>                    Defendants. | Civ. Action No. 20-2262 (EGS) |

## MEMORANDUM OPINION

Plaintiffs—four voter-eligible individuals from Texas, Pennsylvania, New York, and Wisconsin—bring this lawsuit against Defendants President Donald J. Trump ("President Trump"), in his official capacity as President of the United States; Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States; and the United States Postal Service ("USPS") alleging (1) violation of the constitutional right to vote; (2) civil conspiracy to violate the right to vote; and (3) *ultra*

*vires* agency action. Am. Compl., ECF No. 49.[1] Plaintiffs seek a preliminary injunction with regard to each of their claims.

Upon consideration of the Plaintiffs' motion, the response, and reply thereto, the applicable law, and the entire record, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

# I. Background

## A. Factual Background

### 1. The COVID-19 Pandemic

The COVID-19 pandemic has increased reliance on mail delivered by the USPS. *See* Hersh Decl., ECF No. 57-6 ¶ 10. Several states have adjusted their election procedures to allow for all eligible voters to vote by mail-in ballot in the November 2020 election. For example, nine states and the District of Columbia will automatically send voters ballots this year, and another nine states will automatically send voters an application to request an absentee ballot. *Id.* ¶ 12. In addition, "some 77% of Americans live in jurisdictions in which anyone can request a mail ballot (without an excuse) or are mailed applications to vote by mail or are mailed actual ballots to cast votes by mail." *Id.* ¶ 14. In total, the adjustments made by many states in response to the COVID-19 pandemic will result

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

in approximately 80 million mail-in ballots being submitted for the November election. *See id.*

### 2. USPS Postal Policy Changes

In June and July 2020, the USPS announced and implemented a series of changes (collectively, "Postal Policy Changes") to how it collects, processes, and delivers mail.

First, in a "leaked PowerPoint" titled "PMGs expectations and plan," USPS announced that penalty overtime "will be eliminated" and "[o]vertime will be eliminated" because "we are paying too much in [overtime] and it is not cost effective" ("Overtime Policy"). Am. Compl., ECF No. 49 ¶ 48 (citing *Leaked USPS PowerPoint Indicates PMG DeJoy Focus on Getting Operating Costs Under Control*, Alliance of Nonprofit Mailers (July 14, 2020), nonprofitmailers.org/leaked-usps-powerpoint-indicates-pmg-dejoy-focus-on-getting-operating-costs-under-control/ [hereinafter "USPS PowerPoint"][2]). In testimony before the House Oversight and Reform Committee on August 24, 2020, Mr. DeJoy stated that he "did not direct the elimination or any cutback in overtime." *See* Ex. 14 to Defs.' Response Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 55-4 at 305.

---

[2] Because the USPS PowerPoint is cited and quoted within the Amended Complaint, ECF No. 49, the Court deems the document incorporated by reference in the complaint. *See Boster v. Reliance Standard Life Ins.*, 959 F. Supp. 2d 9, 29 (D.D.C. 2013) (ABJ).

Second, on June 17, 2020, the USPS announced that it would be removing high-speed sorting machines nationwide over the course of several months. Am. Compl., ECF No. 49 ¶¶ 50-51 (citing Letter from Rickey R. Dean, Manager of Contract Admin., Am. Postal Workers Union, to Mark Diamondstein, Pres., Am. Postal Workers Union (June 17, 2020), https://www.21cpw.com/wp-content/uploads/2020/06/mail-processing-equipment-reduction_6-17-2020.pdf[3]); *see also* Ex. A to Reply Further Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 57-2. Defendants state that the further removal of equipment has been suspended until after the November 2020 election. Defs.' Opp'n, ECF No. 55 at 23-24.

Third, on July 10, 2020, the USPS announced several "transportation changes," including changes prohibiting "late trips" and "extra trips" ("Late/Extra Trips Policy"). Am. Compl., ECF No. 49 ¶ 52 (citing Jory Heckman, *USPS Warns Staff of Temporary Mail Delays As It Cuts 'Soaring' Delivery Costs*, Fed. News Network (July 15, 2020), https://federalnewsnetwork.com/management/2020/07/usps-warns-staff-of-temporarymail-delays-as-it-cuts-soaring-delivery-costs[4]). The USPS knew that prohibiting these trips would result

---

[3] The Court considers this document as incorporated by reference in the Amended Complaint. *See supra* n.2.
[4] The Court takes judicial notice of the existence of the news article. *See Washington Post v. Robinson*, 935 F.2d 282, 291

in delayed mail delivery: "[One] aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or mail on the workroom floor or docks (in P&DCs) . . . ." *Id.* ¶ 53. By August 13, 2020, the USPS had reduced the number of extra trips by 71 percent. Pls.' Reply, ECF No. 57 at 8 (citing *Path Forward: PMG Addresses Restructuring*, USPS LINK (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2[5]). Defendants have clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level." Cintron Decl., ECF No. 55-3 ¶ 4. On September 21, 2020, USPS also issued "Operational Instructions" providing that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." *See* Ex. A to Notice Suppl. Material, ECF No. 62-1 at 4.

---

(D.C. Cir. 1991) ("[A] court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts); *Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known as a result of newspaper articles).
[5] The Court takes judicial notice of this document. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on the District of Columbia's Retirement Board website).

Fourth, on July 16, 2020, the USPS announced another "initiative" that prohibited mail carriers in certain cities from spending time in the morning sorting mail so they could "leave for the street earlier." Mem. Points Authorities Supp. Pls.' Appl. Prelim. Inj. ("Pls.' Mot."), ECF No. 15 at 22. The National Association of Letter Carriers thereafter expressed concern that "USPS chose to test [the initiative] unilaterally" without their participation and because it did not seem to "conform" with specific USPS handbook provisions regarding certain types of mail. *See* Am. Compl., ECF No. 49 ¶¶ 54-55 (citing *USPS Announces New ESAS Delivery Initiative Test*, Nat'l Ass'n of Letter Carriers (July 21, 2020), https://www.nalc.org/news/nalc-updates/usps-announces-new-esas-delivery-initiative-test[6]). A subsequent USPS internal memo clarified that the initiative meant that "[c]ity carriers will not sort any mail during the morning operation," but will instead sort delivery in the afternoon "[u]pon return from street delivery." *Id.* ¶ 56 (citing Memorandum from USPS (July 2020), http://www.nalc3825.com/SUT.ESAS.July.2020.pdf[7]). Defendants state that this program has been "suspended at the Postmaster General's Direction." Defs.' Opp'n, ECF No. 55 at 28.

---

[6] The Court considers this document as incorporated by reference in the Amended Complaint. *See supra* n.2.
[7] The Court considers this document as incorporated by reference in the Amended Complaint. *See supra* n.2.

Fifth, on August 7, 2020, Mr. DeJoy "released a reorganization memo reflecting that twenty-three postal executives, including several with decades of experience, were reassigned or displaced." Am. Compl., ECF No. 49 ¶ 59 (citing Jacob Bogage, *Postal Service Overhauls Leadership as Democrats Press for Investigation of Mail Delays*, Wash. Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigationdejoy[8]). In addition, USPS announced it had implemented a "management hiring freeze and will be requesting future Voluntary Early Retirement Authority from the Office of Personnel Management for employees not represented by a collective bargaining agreement." *Id.* ¶ 60 (citing Press Release, *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission* (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-modifiesorganizational-structure.htm[9]). Defendants have stated that "[f]or a period of time beginning in August 2020, there has been a management hiring freeze for all non-bargaining unit

---

[8] The Court takes judicial notice of the existence of the news article. *See supra* n.4.
[9] The Court takes judicial notice of the USPS press release because it is a federal agency document available from a reliable source. *See Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 68 n.4 (D.D.C. 2019) (CKK).

employees. However, that hiring freeze has had no impact on craft employees. Indeed, [USPS] has hired thousands of new employees to help address staff shortages caused by the pandemic." Curtis. Decl., ECF No. 55-1 ¶ 25.

Sixth, in August 2020, USPS also began removing mailboxes in New York, Pennsylvania, Oregon, and Montana. Pls.' Mot., ECF No. 15 at 22. Defendants state that the removal of mailboxes has been suspended until after the November 2020 election. Defs.' Opp'n, ECF No. 55 at 23-24.

Seventh, on or around July 29, 2020, the USPS General Counsel informed 46 states and the District of Columbia that if the states did not pay First Class postage on ballots sent to voters, there would be a risk that voters would not receive their ballots in time to return them by mail. *See* Pls.' Reply, ECF No. 57 at 12; *see also* Goldway Decl., ECF No. 57-7 ¶¶ 4-6. This was a change to the USPS practice of treating "Election Mail"[10] and political mail mailed as marketing mail on an expedited First-Class basis. Pls.' Reply, ECF No. 57 at 12; *see also* Goldway Decl., ECF No. 57-7 ¶¶ 5-7.

---

[10] USPS defines "Election Mail" as "any item mailed to or from authorized election officials that enables citizens to participate in the voting process. This includes ballots, voter registration forms, ballot applications, polling place notifications, and similar materials. This mail qualifies as Election Mail both when it is sent to voters from election officials at the state and local levels and when it is returned by voters to those officials." Glass Decl., ECF No. 55-2 ¶ 3.

**3. USPS Postal Policy Changes Have Led To Nationwide Delays And Continue To Have A Nationwide Impact**

"[O]n-time mail delivery fell abruptly following . . . [Mr.] DeJoy's July 2020 directives ordering operational changes in mail service and delivery. By the second week of August 2020, on-time delivery of First-Class Mail nationwide had fallen nearly 10 percentage points compared to the week preceding the change." Pls.' Reply, ECF No. 57 at 9-10 (quoting Senator Gary Peters, U.S. Senate Comm. on Homeland Sec. & Gov't Affairs, *Failure to Deliver: Harm Caused by U.S. Postmaster General DeJoy's Changes to Postal Service Mail Delivery* 3 (Sept. 16, 2020), https://www.hsgac.senate.gov/imo/media/doc/200916_FullReport_PetersPostalInvestigation.pdf [hereinafter "Senate Report"][11]); *see also* Senate Report at 1 ("[T]hese changes significantly slowed mail delivery across the entire country and, as Senator Peters wrote to Postmaster General DeJoy and detailed in an interim report, 'compromised service for veterans, small businesses, rural communities, seniors, and millions of Americans who rely on the mail for medicines, essential goods, voting, correspondence, and for their livelihoods.'"). In an August 13, 2020 email to all USPS employees, Mr. DeJoy

---

[11] The Court takes judicial notice of the Senate report. *See Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 313 n.30 (D.D.C. 2018) (RC).

acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." *Path Forward: PMG Addresses Restructuring*, USPS LINK (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2.

On August 18, 2020, Mr. DeJoy issued a statement that the USPS would be suspending "some longstanding operational initiatives—efforts that predate my arrival at the Postal Service—that have been raised as areas of concern as the nation prepares to hold an election in the midst of a devastating pandemic." Am. Compl., ECF No. 49 ¶ 63 (quoting Press Release, USPS, Postmaster General Louis DeJoy Statement (Aug. 18, 2020), https://about.usps.com /newsroom/national-releases/2020/0818-postmaster-general-louis-dejoy-statement.htm[12]). Specifically, Mr. DeJoy stated that: (1) "[r]etail hours at Post Offices will not change"; (2) "[m]ail processing equipment and blue collection boxes will remain where they are"; (3) "[n]o mail processing facilities will be closed"; (4) "overtime has, and will continue to be, approved as needed." Press Release, USPS, Postmaster General Louis DeJoy Statement (Aug. 18, 2020), https://about.usps.com

---

[12] The Court takes judicial notice of the USPS press release because it is a federal agency document available from a reliable source. *See supra* n.9.

/newsroom/national-releases/2020/0818-postmaster-general-louis-dejoy-statement.htm.

Defendants state that "[t]he only exception to [Mr. DeJoy's] directive to maintain the status quo through Election Day pertains to the ongoing effort to improve compliance with existing schedules throughout USPS's transportation and processing networks." Defs.' Opp'n, ECF No. 55 at 22. However, USPS has announced that employees "are not to reconnect/reinstall machines that have been previously disconnected without prior approval from HQ Maintenance." Am. Compl., ECF No. 49 ¶ 64 (quoting Aaron Gordon, *USPS Headquarters Tells Managers Not to Reconnect Mail Sorting Machines, Emails Show*, Vice News (Aug. 20, 2020), https://www.vice.com/en_us/article/xg8k4d/usps-emails-tell-managers-not-toreinstall-mail-sorting-machines-postmaster-general-dejoy[13]); *see also id.* ¶¶ 96, 111-12. In addition, USPS announced it does not plan to reinstall the mailboxes removed after June 16, 2020. Am. Compl., ECF No. 49 ¶ 119.

### 4.   Plaintiffs' Factual Allegations

Plaintiffs seek "injunctive relief to protect [their] right to vote by ensuring that the United States Postal Service delivers absentee and mail-in ballots in a timely fashion to

---

[13] The Court takes judicial notice of the existence of the news article. *See supra n.4.*

them and then, delivers their executed ballots to election officials in time to be counted." *See* Am. Compl., ECF No. 49 ¶ 10. Each of the Plaintiffs allege that they applied for, but never received, an absentee or mail-in ballot during the 2020 primary elections due to the "several steps calculated to slow down – and to undermine – the [USPS's] ability to deliver the mail, all in the name of cost-cutting but at the expense of the right of citizens to vote." Am. Compl., ECF No. 49 ¶¶ 10-11, 16. Plaintiffs allege that these delays will continue into November, leaving them "with the choice of compromising their right to vote by not voting at all or risking their health." *Id.* ¶¶ 19, 176.

Because they never received their ballots through the mail, each Plaintiff was forced to either vote in-person, risking contracting COVID-19 or infecting at-risk individuals with whom they live, or not vote at all. *Id.* ¶¶ 11-12. For example, Plaintiff Teresa Richardson resides in Texas and applied for an absentee ballot, based on "disability," for the July primary election in her state. Ms. Richardson suffers from "debilitating arthritis that has resulted in two hip replacements, a shoulder replacement, and an expected knee replacement" and is a "high risk for COVID-19" because she is currently undergoing "prophylactic treatment resulting from a breast cancer diagnosis." Richardson Decl., ECF No. 15-2 ¶¶ 4-7. Ms.

Richardson applied for an absentee ballot on or around April 24, 2020, but she never received the ballot. *Id.* ¶¶ 10-12. She decided to vote in person on July 14, 2020. *Id.* In Texas, applications to vote by mail must be received 11 days before Election Day; all ballots submitted by mail must be postmarked by Election Day and be received by the day after Election Day. *See FAQ*, Off. of the Tex. Sec'y of State (last visited Oct. 8, 2020), https://www.votetexas.gov/faq/index.html.

Plaintiff Christopher Carroll is a registered voter in Pennsylvania and requested a ballot for the June 2020 primary election in his state. Carroll Decl., ECF No. 15-3 ¶¶ 1, 3-5. He never received his ballot, so he was unable to vote because he was out of the state on the date of the election. *Id.* ¶ 5. In Pennsylvania, applications to vote by mail must be received 7 days before Election Day; all ballots submitted by mail must be postmarked by Election Day and be received within 3 days after Election Day. *See Voting by Mail-in or Absentee Ballot*, Commonwealth of Pa. (last visited Oct. 8, 2020), https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx.

Plaintiff Gina Arfi is a registered voter in New York and requested an absentee ballot for the primary election "based on temporary illness or physical disability." Arfi Decl., ECF No. 15-4 ¶¶ 1, 3. Ms. Arfi never received her ballot; she decided

13

not to vote because, as she lives with her 85-year-old grandmother, she was concerned about exposing herself and her grandmother to COVID-19. *Id.* ¶ 5. In New York, applications to vote by mail must be received 7 days before Election Day; all ballots submitted by mail must be postmarked by Election Day and be received within 7 days after Election Day. *See Absentee Voting*, N.Y. State Bd. of Elections (last visited Oct. 8, 2020), https://www.elections.ny.gov/votingabsentee.html.

Finally, Plaintiff Aida Zygas is registered to vote in Wisconsin and requested an absentee ballot for the August 2020 elections in her state because she did not think she would be in the state on the day of the election. Zygas Decl., ECF No. 15-5 ¶¶ 1, 3. She did not receive a ballot; however, she returned to Wisconsin in time for the election and decided to vote in person. *Id.* ¶ 4. In Wisconsin, applications to vote by mail must be received 5 days before Election Day.  All ballots submitted by mail must be postmarked by Election Day and be received within 6 days after Election Day. *See Overview of Absentee Voting Rules*, Wis. Elections Comm'n (last visited Oct. 8, 2020), https://elections.wi.gov/sites/default/files/publication/137/abs entee_overview_1_27_16_pdf_14821.pdf.

## B. Procedural History

Plaintiffs filed this lawsuit on August 17, 2020. *See generally* Compl., ECF No. 1. On August 20, 2020, Plaintiffs

filed a motion for preliminary injunction requesting that the

Court direct Defendants to:

> (1) return postal operations and restore
> postal service to that in place on January 1,
> 2020; (2) replace or restore the removed the
> high-speed sorting machines and mailboxes that
> have been taken out of service and put them
> back into operation; (3) restore overtime pay
> and lift the hiring freeze so that USPS can
> hire additional employees when and where
> necessary to ensure the timely processing and
> delivery of mail-in ballots; (4) make all late
> mail deliveries instead of letting mail be
> delayed or go undelivered; (5) restore
> seasoned employees to their former positions,
> including the employees who were reassigned or
> displaced in the recent USPS reorganization;
> and (6) refrain from any and all other conduct
> that is intended to interfere and/or
> interferes with Plaintiffs' fundamental right
> to vote in United States elections, including
> but not limited to the 2020 presidential
> election.

Pls.' Appl. Prelim. Inj., ECF No. 14. Plaintiffs also request

that the Court appoint a special master to oversee Defendants'

compliance with any injunction. Pls.' Mot., ECF No. 15 at 28. On

September 11, 2020, Plaintiffs filed an amended complaint

against Defendants, replacing its claim that Defendants' conduct

violated the Administrative Procedure Act with a claim that the

USPS policy changes represent *ultra vires* agency action.[14] Am.

---

[14] Although Plaintiffs filed their amended complaint after filing
their motion for preliminary injunction and before Defendants
filed their opposition, the Court finds it appropriate to refer
to the factual allegations in the amended complaint. *See
Takiguchi v. MRI Int'l, Inc.*, 611 F. App'x 919, 921 (9th Cir.
2015) (dismissing the argument that the "district court

Compl., ECF No. 49. Defendants filed their opposition to
Plaintiffs' motion for preliminary injunction on September 15,
2020. Defs.' Opp'n, ECF No. 55. Plaintiffs filed their reply
brief on September 20, 2020. Pls.' Reply, ECF No. 57. The motion
is ripe for the Court's consideration.

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must
establish [1] that he is likely to succeed on the merits, [2]
that he is likely to suffer irreparable harm in the absence of
preliminary relief, [3] that the balance of equities tips in his
favor, and [4] that an injunction is in the public interest."
*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration
in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392
(D.C. Cir. 2011)). Where the federal government is the opposing
party, the balance of equities and public interest factors

---

improperly considered evidence that the plaintiffs submitted
with their preliminary injunction reply brief and allegations
pleaded for the first time in the Third Amended Complaint, which
was filed after all of the preliminary injunction briefing,"
because "even if it were error to do so, it would be harmless,
*see United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th
Cir. 1992), because the mere allegations of a complaint will
never suffice to establish the prerequisites for obtaining a
preliminary injunction, *see Winter v. NRDC, Inc.*, 555 U.S. 7,
20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)"); *Vantage Mobility
Int'l LLC v. Kersey Mobility LLC*, No. 19-cv-04684, 2020 WL
411188, at *1 (D. Ariz. Jan. 24, 2020) ("Although VMI filed the
First Amended Complaint ('FAC') after the Preliminary
Injunction Application, the Court will resolve the Application
by considering the FAC as the operative pleading . . . .").

merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A
preliminary injunction is an "extraordinary remedy that may only
be awarded upon a clear showing that the plaintiff is entitled
to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555
U.S. 7, 22 (2008) (citation omitted). "The purpose of a
preliminary injunction is merely to preserve the relative
positions of the parties until a trial on the merits can be
held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In
this Circuit, the four factors have typically been evaluated on
a "sliding scale," such that if "the movant makes an unusually
strong showing on one of the factors, then it does not
necessarily have to make as strong a showing on another factor."
*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92
(D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v.
Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C.
Circuit has suggested that a positive showing on all four
preliminary injunction factors may be required." *Holmes v. FEC*,
71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644
F.3d at 393 ("[W]e read *Winter* at least to suggest if not to
hold that a likelihood of success is an independent, free-
standing requirement for a preliminary injunction." (citation
and quotation marks omitted)). Nonetheless, "the Circuit has had
no occasion to decide this question because it has not yet

encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## III. Analysis

### A. Plaintiffs Are Likely To Succeed On The Merits Of Their Claim

Plaintiffs claim that they have shown a likelihood of success on the merits of all three of their claims: (1) violation of the right to vote and the right to equal protection;[15] (2) civil conspiracy; and (3) *ultra vires* agency action. Because the Court finds that Plaintiffs have shown they will likely succeed on their claim that Defendants' policy changes violated their fundamental right to vote, the Court need not evaluate Plaintiffs' two other claims at this time.

### 1. Plaintiffs Likely Have Standing

As a threshold matter, Defendants argue that Plaintiffs have failed to establish that they have standing to bring their claim. Defs.' Opp'n, ECF No. 55 at 30.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between

---

[15] Plaintiffs bring their equal protection claim under the Fourteenth Amendment. Am. Compl., ECF No. 49 at 49. Because Defendants are subject to the Fifth Amendment to the United States Constitution but not to the Fourteenth, the Court construes the complaint as one bringing a claim under the Fifth Amendment.

the injury and the conduct complained of,' and (3) a
'likel[ihood]' that the injury 'will be redressed by a favorable
decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334,
2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555,
560-61 (1992)). "Standing to seek . . . forward-looking
injunctive relief requires [Plaintiff] to show that it is
suffering an ongoing injury or faces an immediate threat of
injury. For a future injury, that means submitting evidence
showing that there is a substantial risk that the harm will
recur." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
949 F.3d 8, 13 (D.C. Cir. 2020) (internal quotation marks,
citations, and alterations in original omitted).

    "The party invoking federal jurisdiction bears the burden
of establishing these elements." *Lujan*, 504 U.S. at 561
(citations omitted). "Since they are not mere pleading
requirements but rather an indispensable part of the plaintiff's
case, each element must be supported in the same way as any
other matter on which the plaintiff bears the burden of proof,
*i.e.,* with the manner and degree of evidence required at the
successive stages of the litigation." *Id*.

    Defendants contend that Plaintiffs have not established
that any future injury is "certainly impending," Defs.' Opp'n,
ECF No. 55 at 31 (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C.
Cir. 2015)), arguing that the fact "[t]hat Plaintiffs may have

19

failed to receive their absentee ballots for the primary
elections does nothing to establish a real and immediate threat
that they will again fail to receive their absentee ballots for
the November 2020 general election," *id.* (alterations and
quotation marks omitted) (quoting *City of Los Angeles v. Lyons*,
461 U.S. 95, 105 (1983)). Defendants contend that "Plaintiffs
have put forth no evidence (or allegation) supporting
Plaintiffs' inference that they failed to receive their absentee
ballots for the primary elections due to any purported recent
changes to USPS policies." Defs.' Opp'n, ECF No. 55 at 31.
Because Plaintiffs cannot rule out "several alternative
explanations" for why Plaintiffs never received their absentee
ballots in time for the primary elections, Defendants argue that
this "undermines" Plaintiffs' future injury allegation and
theory of redressability. *Id.*

The Court disagrees. Plaintiffs exclusively seek
prospective injunctive relief. Am. Compl., ECF No. 49 ¶ 10
("This is a suit for injunctive relief to protect the
Plaintiffs' right to vote by ensuring that the United States
Postal Service delivers absentee and mail-in ballots in a timely
fashion to them and then, delivers their executed ballots to
election officials in time to be counted."). Under D.C. Circuit
precedent, "the proper way to analyze an increased-risk-of-harm
claim is to consider the ultimate alleged harm," which in this

case would be disenfranchisement in the November 2020 election,
"as the concrete and particularized injury and then to determine
whether the increased risk of such harm makes injury to an
individual citizen sufficiently 'imminent' for standing
purposes." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C.
Cir. 2017) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808
F.3d 905, 913 (D.C. Cir. 2015)). Here, Plaintiffs provided
evidence that changes in USPS policy caused and will continue to
cause delays in the delivery of mail. *See* Grimmer Decl., ECF No.
57-4 ¶ 10 (decrease in the number of extra or late trips will
delay the delivery of letters); Tr., *Jones v. U.S. Postal Serv.*,
No. 20-cv-6516 (S.D.N.Y. Sept. 16, 2020), Ex. D to Pls.' Reply,
ECF No. 57-5 at 24-25 (mail processing clerk at the San Antonio
Main Post Office testified under oath that the plant was
experiencing a "two to three day[]" delay and expected the delay
to continue into November because (1) "they're shifting people
around into positions of no expertise"; (2) "they're hiring
brand new employees with no official training to know how to
expedite the mail properly and running the right sort programs";
and (3) "they're cutting back on overtime").

Plaintiffs have cited evidence that delays in mail service,
both locally and nationally, correlate with the timing of the
USPS policy changes in July and have continued at least into the
month of August. *See* Pls.' Reply, ECF No. 57 at 9-10 ("By the

second week of August 2020, on-time delivery of First-Class Mail
nationwide had fallen nearly 10 percentage points compared to
the week preceding the changes." (quoting Senate Report at 3));
Senate Report at 3 (finding that "[s]ome parts of the country
saw on-time delivery drop by 15-20 percentage points in the
weeks following Mr. DeJoy's July 2020 changes"). In addition,
USPS's own data shows declines in on-time delivery of First-
Class Mail continuing into August. Grimmer Decl., ECF No. 57-4
at 24-25. The Court thus finds that Plaintiffs have shown they
face a "'substantial risk' of future injury," *Attias*, 865 F.3d
at 627, that is "fairly traceable" to the USPS policy changes,
*Lujan*, 504 U.S. at 560.

Defendants also claim that even if the USPS policy changes
did cause the primary ballots to never arrive, that still does
"not support an inference that these delays will affect
Plaintiffs in particular again" because Plaintiffs have not
alleged that the mail delays "affect all voters across-the-board
. . . [or that they] are uniquely susceptible to these delays."
Defs.' Opp'n, ECF No. 55 at 32. Defendants argue that
"Plaintiffs' allegations also fail to account for the fact that
the delays that affected USPS in July are being remedied, . . .
or the tremendous amount of resources that USPS has pledged to
support the upcoming election." *Id.* However, as stated above,
there is sufficient evidence to show that Defendants' policy

changes continue to have nationwide effects on the timely delivery of mail. *See* Senate Report at 3 (finding that nationwide during the second week of August, "85 million more deliveries were late in a single week compared to what the late deliveries would have been that week under on-time delivery rates before the changes"); Grimmer Decl., ECF No. 57-4 at 24-25.

For all of these reasons, the Court finds that Plaintiffs' have standing.

### 2. The Applicable Legal Standard

Prior to considering the likelihood of success on the merits, the parties disagree on which legal standard should govern Plaintiffs' claim that the USPS policy changes infringe upon their constitutional right to vote.

Plaintiffs argue that "[d]elaying mail-in ballots places an unconstitutional burden on Plaintiffs' right to vote and merits strict scrutiny." Pls.' Reply, ECF No. 57 at 22. In Plaintiffs' view, "[l]aws that govern the handling of ballots are reasonably understood as directly regulating the election, whether the ballot is handled by a poll worker or a mail handler or letter carrier." *Id.* at 21. Defendants, on the other hand, argue that because the USPS policy changes only indirectly affect Plaintiffs, the rational basis test should apply. Defs.' Mot., ECF No. 55 at 33. Defendants contend that the cases Plaintiffs

23

cite in favor of applying strict scrutiny are inapplicable because the cases are factually distinguishable or only concern state election laws that directly regulate the electoral process. *Id.* But even if the Court considers this case analogous to the line of cases involving "election laws," Defendants contend that the Court would still apply the rational basis test under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969).

In *McDonald*, the Supreme Court held that an Illinois statute that denied certain inmates mail-in ballots did not impose an unconstitutional burden on their right to vote. *Id.* at 807. Rather, the statute only restricted their asserted right to receive an absentee ballot, and they were therefore not "absolutely prohibited from voting by the State." *Id.* at 808 & n.7. The Supreme Court noted that "the record is barren of any indication that the State might not, for instance, possibly furnish the jails with special polling booths . . . or provide guarded transportation to the polls." *Id.* at 808 n.6. The Court further noted that a more rigid standard is proper only when the policy or practice at issue categorically "den[ies] [plaintiffs] the exercise of the franchise . . . preclud[ing] [them] from voting." *Id.* at 807-08. Accordingly, the Supreme Court upheld the statute under rational basis review. *Id.* at 811. Defendants argue that McDonald is controlling because "Plaintiffs are

24

claiming that USPS policies may deprive them of the ability to cast votes through mail-in ballots" and Plaintiffs' "position is not materially different from the county jail inmates in *McDonald* who were physically restricted from the polls." Defs.' Opp'n, ECF No. 55 at 34-35.

Although Plaintiffs concede that they are not wholly prohibited from voting, as they may choose to vote in person if they do not receive a mail-in ballot in time, the Court finds that *McDonald* is inapplicable here. First, Defendants mischaracterize Plaintiffs' claim in this case. Plaintiffs do not broadly challenge the USPS policy changes as denying them the right to receive mail-in ballots, as was at issue in *McDonald*. There is no dispute that Plaintiffs are eligible to vote by mail under their respective state laws. Rather, the question here is whether USPS may implement a policy that may arbitrarily prevent a large swath of voters, eligible to receive a mail-in ballot, from receiving their ballots in the first place. Second, as the Supreme Court noted in a concurring opinion, *McDonald* involved a "relatively trivial inconvenience encountered by a voter unable to vote by absentee ballot when other means of exercising the right to vote [were] available." *O'Brien v. Skinner*, 414 U.S. 524, 532 (1974) (Marshall, J., concurring) (noting that the record in *McDonald* was "barren of any indication" that the State would not provide alternative

avenues to vote). Here, however, the Court concludes that in-person voting in the midst of the ongoing COVID-19 pandemic is more than a mere "trivial inconvenience." Because COVID-19 spreads mainly from person-to-person, *see Frequently Asked Questions*, Centers for Disease Control and Prevention (last updated Sept. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html, all voters, including Plaintiffs, place themselves at risk of contracting a potentially terminal infection should they choose to vote in person as a result of failing to receive their mail-in ballots in time. In such circumstances, which were absent in *McDonald*, the Court finds there is a burden on individuals' ability to effectuate their right to vote. Accordingly, *McDonald*'s rational basis test is inappropriate.

The Court also declines to apply strict scrutiny to the claim automatically, as Plaintiffs suggest. Rather, the Court finds that the *Anderson-Burdick* framework, derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), likely applies here. Under the *Anderson-Burdick* line of cases, courts have recognized that "'[e]lection laws will invariably impose some burden upon individual voters,' and that not all laws burdening the right to vote are subject to strict scrutiny." *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73-74 (D.C. Cir. 2012) (alteration in

26

original) (quoting Burdick, 504 U.S. at 433-34). Instead, courts
"must first consider the character and magnitude of the asserted
injury" to the plaintiffs' right to vote against "the precise
interests put forward by the [government] as justifications for
the burden imposed[,]" including "the legitimacy and strength of
each of those interests" and "the extent to which those
interests make it necessary to burden the plaintiff's rights."
*Anderson*, 460 U.S. at 789. The level of scrutiny a court should
apply depends on the burden. When a voter's rights are
"subjected to severe restrictions, the regulation must be
narrowly drawn to advance a state interest of compelling
importance." *Burdick*, 504 U.S. at 434 (internal quotation marks
omitted). But when a voter's rights are subjected only to
"reasonable, nondiscriminatory restrictions," "the State's
important regulatory interests are generally sufficient to
justify the restrictions." *Id.* (internal quotation marks
omitted). If the restriction falls somewhere between those two
poles, then the court uses a flexible analysis, "where the more
severe the burden, the more compelling the [government's]
interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th
Cir. 2018).

Courts have applied this framework in the context of non-
election laws that have an effect on voters' rights or political
candidates' rights. For example, in *Monserrate v. New York State*

27

*Senate*, 599 F.3d 148 (2d Cir. 2010), the United States Court of Appeals for the Second Circuit addressed a First Amendment challenge to the New York Senate's decision to expel a senator who had been accused of domestic violence. *Id.* at 152-53. The Second Circuit found that the *Anderson-Burdick* line of cases was not limited to the pre-vote election law context, stating that the Supreme Court had "minimized the extent to which voting rights are distinguishable from ballot access cases" because "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Id.* at 155 (internal citations and quotation marks omitted). Accordingly, the Second Circuit applied the *Anderson-Burdick* test in analyzing whether the senator's expulsion burdened constitutional rights related to voting and political association. *Id.*; *see also Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 622-23 (8th Cir. 1997) (analyzing a board resolution prohibiting a newly elected ambulance board member from voting on certain matters because her husband worked for the ambulance district under the *Anderson-Burdick* framework); *Hussey v. City of Portland*, 64 F.3d 1260, 1262, 1264 (9th Cir. 1995) (applying the *Anderson-Burdick* framework in evaluating the constitutionality of an "ordinance requiring non-residents to consent to annexation as a condition of receiving a subsidy, or reduction in hook-up costs, for mandated sewer connections," finding that consents were the

"constitutional equivalent" of voting). In addition, courts
within this Circuit have relied upon the *Anderson-Burdick*
framework in analyzing "state" practices that allegedly burden
parties' ability to cast their votes effectively under both the
Fifth Amendment and the Fourteenth Amendment. *See, e.g.*,
*Libertarian Party*, 682 F.3d at 74 (analyzing under *Burdick*
plaintiffs' First and Fifth Amendment claims that the District,
"consistent with its regulations, never reported which
individuals were penciled in by voters choosing the write-in
option or how many votes any such individual accrued"); *Turner
v. D.C. Bd. of Elections & Ethic*s, 77 F. Supp. 2d 25, 30, 33
(D.D.C. 1999) (RWR) (analyzing the constitutionality of
Congress's 1998 District of Columbia Appropriations Act under
*Burdick*, among other standards, where the Act barred the D.C.
Board of Elections and Ethics from counting, releasing, and
certifying the results of a referendum). *But see LaRouche v.
Fowler*, 152 F.3d 974, 994 (D.C. Cir. 1998) (finding that the
*Burdick* test was inappropriate in a challenge against the
Democratic National Committee's internal rules because the test
"was not designed for a case in which the First Amendment weighs
on both sides of the balance").

Here, regardless of the intent behind the changes, the USPS
policy "will invariably impose some burden upon individual
voters" and their constitutional rights in an election year.

*Libertarian Party*, 682 F.3d at 73-74. The USPS directly affects how Election Mail is handled and the speed with which Election Mail arrives at its intended destination. While the USPS serves many other functions, its role in handling ballots compels the conclusion that USPS plays an active role in ensuring that elections are conducted in a "fair and honest" manner, "rather than chaos." *Burdick*, 504 U.S. at 433 (citation omitted). Furthermore, the Court is not convinced that the *Anderson-Burdick* framework is limited to only state government and not federal government actions. To so find would effectively exclude, for example, any federal legislation impacting elections in the District of Columbia pursuant to Congress's plenary power over the District. *See* U.S. Const. art. I § 8; *Palmore v. United States*, 411 U.S. 389, 397 (1973). In addition, this case does not present the same concerns as the D.C. Circuit noted in *LaRouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998), where the court noted that applying *Anderson-Burdick* to the rules of a non-state political party was inappropriate because "the presence of First Amendment interests on both sides of the equation makes inapplicable the test applied to electoral restrictions where the First Amendment weighs on only one side." *Id.* at 995.

Although Defendants argue that failing to apply the rational basis test to "non-election policies that may have some

indirect impact on the electoral process would produce odd
results," including that "any deficiency in USPS service could
give rise to a constitutional voting rights claim," Defs.'
Opp'n, ECF No. 55 at 33-34, the Court disagrees. The Court first
notes that Defendants' claim that the policy changes implemented
by USPS only inadvertently or indirectly affect voting rights is
unpersuasive, particularly in a year in which the global COVID-
19 pandemic has forced many individuals to decide either to vote
by mail-in ballot or to not vote at all. *See Jones v. U.S.
Postal Serv.*, No. 20-cv-6516, 2020 WL 5627002, at *14 (S.D.N.Y.
Sept. 21, 2020) ("The Court . . . disagrees with the Government
that this case does not implicate 'the counting of votes.' To
hold otherwise would be to ignore the facts at hand: a large
number of voters will be exercising their right to vote in the
November 2020 election by placing their ballots in the mail.
There is simply no reason for the Court to ignore the severe
reality that the country is in the middle of a deadly pandemic .
. . ."). For the upcoming election in November, it is estimated
that 80 million ballots will be submitted by mail. *See* Hersh
Decl., ECF No. 57-6 ¶ 14. The USPS policy thus directly impacts
and controls the ability of millions of citizens to have their
vote counted. Defendants themselves do not dispute their unique
role within the electoral process and their "longstanding
commitment to the timely delivery of Election Mail." Defs.'

Opp'n, ECF No. 55 at 13. Even beyond delivering mail-in ballots, USPS conducts "extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots"; gives an "Election Mail Kit" to "approximately 11,500 state and local election officials"; and has established a separate "bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the Election." *Id.* at 12-13. This relationship between the USPS and the electoral process suggests a strong connection with the protection of voters' rights. In addition, a finding that the *Anderson-Burdick* framework applies does not necessarily mean that "any deficiency in USPS service could give rise to a constitutional voting rights claim." *Id.* at 33. This case does not allege that inadvertent, run-of-the-mill delays in the postal service will infringe on their right to vote in the November 2020 election. Instead, Plaintiffs are alleging that a series of deliberate nationwide changes in postal service procedures has caused a widespread slow-down in mail delivery times, that the changes directly affect their ability to vote, and that Defendants are aware that the policy changes affect the timely delivery of mail, including Election Mail. *See* Pls.' Reply, ECF No. 57 at 7-10.

Accordingly, the Court finds that the *Anderson-Burdick* framework likely applies to Plaintiffs' claim.

### 3. Plaintiffs Have Shown That They Are Likely To Succeed On The Merits Of Their Constitutional Claim

Plaintiffs argue that the USPS policy changes infringe upon their constitutional right to vote and violate the Equal Protection Clause. The Court agrees that, under the *Anderson-Burdick* framework, Plaintiffs have shown that they are likely to succeed on the merits of their claim.

As explained above, under the *Anderson-Burdick* framework, the Court must determine whether "the character and magnitude of the asserted injury to the rights protected by the First and [Fifth] Amendments that the plaintiff seeks to vindicate" outweighs "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into account "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433-34. Next, the court evaluates how much deference to afford to the government's interests. If voting rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* at 434 (internal quotation marks omitted). But when a voter's rights are subjected only to "reasonable, nondiscriminatory restrictions," then courts apply a rational basis review. *Id.* (internal quotation marks omitted).

"It is beyond cavil that 'voting is of the most fundamental

33

significance under our constitutional structure.'" *Burdick*, 504
U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers
Party*, 440 U.S. 173, 184 (1979)); *see also Wesberry v. Sanders*,
376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are
illusory if the right to vote is undermined."). "Obviously
included within the right to choose, secured by the
Constitution, is the right of qualified voters within a state to
cast their ballots and have them counted . . . ." *United States
v. Classic*, 313 U.S. 299, 315 (1941). The right to vote
"includes the right to have one's vote counted on equal terms
with others," *League of Women Voters of Ohio v. Brunner*, 548
F.3d 463, 476 (6th Cir. 2008), and applies to the "initial
allocation of the franchise" as well as to "the manner of its
exercise," *id.* at 477 (quoting *Bush v. Gore*, 531 U.S. 98, 104-05
(2000)). Thus, where a policy creates a situation where "[a]
large number of ballots will be invalidated, and consequently,
not counted based on circumstances entirely out of the voters'
control," the "burden [on the right to vote] is exceptionally
severe." *Gallagher v. N.Y. State Bd. of Elections*, No. 20-cv-
5504, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020); *see also
Doe v. Walker*, 746 F. Supp. 2d 667, 679-80 (D. Md. 2010) ("By
imposing a deadline which does not allow sufficient time for
absent uniformed services and overseas voters to receive, fill
out, and return their absentee ballots, the state imposes a

34

severe burden on absent uniformed services and overseas voters'
fundamental right to vote.").

Here, the Court finds that the "character and magnitude" of
Plaintiffs' asserted injury to the right to vote is significant.
Although Defendants call Plaintiffs' harm "speculative," Defs.'
Opp'n, ECF No. 55 at 35, Plaintiffs have provided sufficient
evidence suggesting that Defendants' policy regarding extra and
late trips has caused and will continue to cause inconsistency
and arbitrary delays in the delivery of mail across the United
States, placing at risk Plaintiffs' ability to receive their
mail-in ballots in time or have them arrive at their local
election office in time. *See* Senate Report at 3 (stating that
"[b]y the second week of August 2020, on-time delivery of First-
Class Mail nationwide had fallen nearly 10 percentage points
compared to the week preceding the [USPS policy changes]");
Grimmer Decl., ECF No. 57-4 at 24-25 (indicating that USPS data
shows that on-time delivery of First-Class Mail had not bounced
back to the average experienced prior to July). For example,
Plaintiffs explain that "[e]ven in states where ballots need
only be postmarked by Election Day, delays of two to three days
are likely to disenfranchise a large portion of the electorate,"
Pls.' Reply, ECF No. 57 at 11, because those ballots still have
to arrive at the election office in time to be counted, *see,
e.g.*, *Voting by Mail-in or Absentee Ballot*, Commonwealth of Pa.

(last visited Oct. 8, 2020), https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx (explaining that, in Pennsylvania, ballots postmarked by Election Day must be received within three days after Election Day). Furthermore, Plaintiffs simply cannot predict when their ballots will arrive at their intended destination. When they will arrive, and whether they will arrive in time to be counted, instead depends upon "arbitrary factors, such as the particular USPS branch that handles their ballots." *Jones*, 2020 WL 5627002, at *16. Indeed, USPS itself has acknowledged the threat of voter disenfranchisement, warning in a July 29, 2020 letter to 46 states and the District of Columbia that USPS "cannot guarantee that all ballots cast by mail for the 2020 presidential election will arrive in time to be counted." Am. Compl., ECF No. 49 ¶ 181; *see also* Pls.' Reply, ECF No. 57 at 10 (citing a July 29, 2020 letter from the USPS General Counsel). Thus, in a year in which it is estimated that 80 million citizens are anticipated to submit their votes via USPS, and between 3.7% and 9.3% of those are estimated to mail ballots on the Saturday before Election Day, the potential for voter disenfranchisement is immense. *See* Hersh Decl., ECF No. 57-6 ¶¶ 14, 21-23.

Furthermore, Defendants' policy changes place an especially severe burden on the Plaintiffs who have no other reasonable choice than to vote by mail, such as those who may be

36

at a high risk of developing a severe case of COVID-19 should they become exposed to the virus at the polling place, who live with individuals at a high risk of severe COVID-19 symptoms, and who are not physically able to travel to the polls because they are out of the state. *See* Pls.' Mot., ECF No. 15 at 11-13. For these individuals, mail-in voting is either the only choice or the only safe choice they have for themselves and their loved ones. Although Defendants point out that Plaintiffs may still vote in person, the Court nonetheless finds that when nationwide policy changes prevent an eligible voter from receiving the mail-in ballot to which she is entitled, and as a result she must choose between either disenfranchisement or risking contracting a potentially terminal disease herself and infecting at-risk persons with whom she lives, the right to vote is heavily burdened.

Defendants argue that the Plaintiffs' claim must fail because there is no constitutional right to vote by mail and states are not required to offer mail-in voting. Defs.' Opp'n, ECF No. 55 at 32-33. Defendants contend that "[i]f a State can prohibit mail-in voting . . . then USPS policies which may indirectly limit when a ballot must be mailed cannot be constitutionally suspect." *Id.* Defendants miss the point. Plaintiffs here are not alleging that Defendants are denying them a right to vote by mail. Rather, Plaintiffs are alleging

37

that the Defendants' policy changes undermine the integrity of the November 2020 election by causing delays in the delivery of election mail, risking disenfranchisement of thousands of voters. Defendants, however, claim that the arbitrariness of the delays actually cuts in their favor. *Id.* at 35-36. Defendants point out that the USPS policy changes "do not expressly (or necessarily) deny anyone a mail-in ballot" and that "[t]o the extent there are mail delays, or certain mail goes undelivered, there is no allegation that USPS has determined in advance the class of persons to be affected." *Id.* But whether there is purposeful or intentional discrimination is irrelevant to the Court's analysis here. *See Bush*, 531 U.S. at 104-05 (finding an Equal Protection Clause violation without making a finding of discriminatory intent). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.*; *see also Reynolds v. Sims*, 377 U.S. 533, 557 (1964) (noting that "arbitrary and capricious action" can violate the Fourteenth Amendment (quoting *Baker v. Carr*, 369 U.S. 186, 226 (1962)). For example, if one of the Plaintiffs submits her ballot, but it does not make it to her local election office in time because of delays caused by the USPS policy, "her 'right to full and effective participation in the political processes of h[er] [Nation]'s legislative bodies' is

38

impaired relative to that of both in-state and out-of-state
voters with access to USPS branches functioning effectively."
*Jones*, 2020 WL 5627002, at *21 (alteration in original) (quoting
*Reynolds*, 377 U.S. at 565); *see also Brunner*, 548 F.3d at 478
(stating that the allegation, among others, that "[p]rovisional
ballots were not distributed to appropriate voters, causing
voters to be denied the right to vote . . . . if true, could
support a troubling picture of a system so devoid of standards
and procedures as to violate" the Constitution).

Against such injuries, Defendants assert that the policy
changes are intended "to increase efficiency" and "minimize
unnecessary costs." Defs.' Opp'n, ECF No. 55 at 36. Defendants
contend that these general "regulatory" interests survive
rational basis review, *id.* (quoting *Libertarian Party*, 682 F.3d
at 77), and that the Court may not find such interests are
irrational because it "disagrees with the policy choice," *id.*
(citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14
(1993). Plaintiffs, on the other hand, dispute that Defendants'
justifications are sufficient to justify the burden imposed on
voters. Plaintiffs argue that the USPS policy changes were in
fact inefficient and increased unnecessary costs. Pls.' Reply,
ECF No. 57 at 22-23. Furthermore, Plaintiffs contend that "USPS
has no constitutional mandate to cut costs" and that
"[v]iolating an important constitutional right in order to

achieve a goal not within its mandate . . . is obviously not legitimate or rational prioritization." *Id.* at 23.

Defendants are correct that "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns, Inc.*, 508 U.S. at 313. However, the Court finds that the bar is higher here. Given the severity of Plaintiffs' harms, the Court must instead determine whether Plaintiffs' injuries are outweighed by Defendants' justifications under at least an intermediate level of scrutiny, if not strict scrutiny. The Court finds that Defendants do not meet either.

The Court respects that the federal government, and USPS in particular, have legitimate interests in maintaining efficient programs and in saving money; however, these interests do not justify the resulting harms Plaintiffs face. As stated above, the burden the USPS policy changes place on Plaintiffs' constitutional right to vote and have their vote counted is significant. At risk is disenfranchisement in the November election of potentially hundreds of thousands of individuals. These harms justify a high level of scrutiny, yet Defendants only generally assert that "USPS did renew its focus on

compliance with pre-set schedules in order to increase
efficiency, and minimize unnecessary costs." Defs.' Opp'n, ECF
No. 55 at 36. Defendants' reasons for administrative cost
savings are insufficient: as the Supreme Court has explained,
the "vindication of conceded constitutional rights cannot be
made dependent upon any theory that it is less expensive to deny
than to afford them." *Watson v. City of Memphis*, 373 U.S. 526,
537 (1963). Furthermore, Defendants have failed to provide any
reasons regarding why implementation of the USPS policy changes
were necessary during a nationwide election season in the middle
of a pandemic, particularly in view of Defendants' express
acknowledgement that they anticipated "mail left behind or mail
on the workroom floor or docks." Mandatory Stand-Up Talk: All
Employees (July 10, 2020), https://federalnewsnetwork.com/wp-
content/uploads/2020/07/071020-stand-up-talk.pdf.[16] And despite
Defendants' assertions to the contrary, as of the end of August,
USPS service scores remained lower that the pre-policy average.
*See* Grimmer Decl., ECF No. 57-4 at 24-25; Pls.' Reply, ECF No.
57 at 9-10 ("By the second week of August 2020, on-time delivery
of First-Class Mail nationwide had fallen nearly 10 percentage
points compared to the week preceding the changes." (quoting
Senate Report at 3)).

---

[16] The Court takes judicial notice of the USPS document regarding
transportation changes. Fed. R. Evid. 201(b)(2).

Accordingly, the Court finds that Plaintiffs are likely to succeed on their constitutional claim.

### B. Plaintiffs Face Irreparable Harm

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

Plaintiffs argue that, because the USPS policy changes infringe upon Plaintiffs' constitutional right to vote, including in the November 2020 election, that alone is sufficient to show irreparable injury for the purposes of seeking equitable relief. Pls.' Mot., ECF No. 15 at 25. Plaintiffs further argue that President Trump has "incentivized" voters to "remain away from the polls" in the November 2020 election by "making statements suggesting that mail-in voting is rife with fraud." *Id.* at 25-26 (quoting *Raysor v. DeSantis*, No. 19A1071, 2020 WL 4006868, at *3 (U.S. July 16, 2020) (Sotomayor, J., dissenting)). Defendants, in opposition, contend that

Plaintiffs' contention that USPS policies have denied them the
right to vote is "insufficient and too speculative" to establish
an irreparable injury. Defs.' Opp'n, ECF No. 55 at 40. Moreover,
Defendants argue that Plaintiffs have not identified any actions
that may "incentivize" them not to vote. *Id.* Nor have Plaintiffs
established than any future harms are likely to recur given that
"USPS has taken a number of steps that have resulted in service
performance improving." *Id.* at 41.

The Court finds that Plaintiffs have sufficiently shown
they will likely suffer irreparable harm absent a preliminary
injunction. At this juncture, Plaintiffs need only demonstrate
the likelihood of an increased risk of injury. *Winter*, 555 U.S.
at 22 ("Our frequently reiterated standard requires plaintiffs
seeking preliminary relief to demonstrate that irreparable
injury is likely in the absence of an injunction."). And, as
described above, Plaintiffs have provided evidence showing that,
due to delays in the delivery of mail, there is a substantial
risk that Plaintiffs will suffer an undue burden on their
constitutional right to vote. *See Obama for Am. v. Husted*, 697
F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental
right to vote . . . constitutes irreparable injury."); *Cardona
v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D.
Cal. 1992) (explaining abridgement "or dilution of a right so
fundamental as the right to vote constitutes irreparable

injury"). There is "no do-over and no redress" once the election has passed. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). The Court further finds Plaintiffs would face irreparable harm in being forced to make a decision on how to vote before they have all of the information they require. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995) ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."). Finally, regarding Defendants' assertion that Plaintiffs have failed to show the likelihood of delivery delays, USPS data suggests that on-time delivery for First Class Mail has not bounced back since the implementation of the policy changes, and Defendants have provided no other information suggesting that that will change prior to Election Day. *See* Grimmer Decl., ECF No. 57-4 at 24–25; Pls.' Reply, ECF No. 57 at 9–10.

The Court finds that the Plaintiffs have sufficiently shown they will likely suffer irreparable harm absent a preliminary injunction due to the restriction on the fundamental right to vote.

**C. The Balance of Equities and Public Interest Favor an Injunction**

The balance-of-equities factor directs the Court to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.*; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "to preserve the relative positions of the parties until a trial on the merits can be held." *Rufer v. FEC*, 64 F. Supp. 3d 195, 206 (D.D.C. 2014) (CRC) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, [555 U.S.] at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (second alteration in original).

Plaintiffs contend that the balance of the equities and the

45

public interest favor a preliminary injunction because it is in
the public interest to prevent constitutional violations and to
allow eligible citizens the ability to exercise their right to
vote. Pls.' Mot., ECF No. 15 at 26-27. Defendants do not contest
the equities in Plaintiffs' favor. Rather, Defendants argue that
the public interest and the balance of the equities disfavor
granting relief because (1) "USPS is currently undertaking
extensive efforts to facilitate the timely delivery of Election
Mail"; (2) "[t]here is no dispute that USPS has the capacity . .
. to handle the anticipated surge in Election Mail"; (3)
"Plaintiffs have an opportunity to avoid any harm by mailing in
their ballots without delay"; and (4) granting relief "could
require the Court to act as an overseer of the agency's day-to-
day activities." Defs.' Opp'n, ECF No. 55 at 41-42.

Here, the balance of the equities and the public interest
favor an injunction. "By definition, '[t]he public interest . .
. favors permitting as many qualified voters to vote as
possible." *League of Women Voters of N.C.*, 769 F.3d at 247-48
(quoting *Husted*, 697 F.3d at 437). It is also clearly in the
public interest to require that USPS implement policies that do
not infringe upon constitutional rights. *Newby*, 838 F.3d at 12
("There is generally no public interest in the perpetuation of
unlawful agency action.").

**D. Request For Preliminary Injunction**

Plaintiffs' motion for preliminary injunction requests the following relief:

> (1) return postal operations and restore postal service to that in place on January 1, 2020; (2) replace or restore the removed the high-speed sorting machines and mailboxes that have been taken out of service and put them back into operation; (3) restore overtime pay and lift the hiring freeze so that USPS can hire additional employees when and where necessary to ensure the timely processing and delivery of mail-in ballots; (4) make all late mail deliveries instead of letting mail be delayed or go undelivered; (5) restore seasoned employees to their former positions, including the employees who were reassigned or displaced in the recent USPS reorganization; and (6) refrain from any and all other conduct that is intended to interfere and/or interferes with Plaintiffs' fundamental right to vote in United States elections, including but not limited to the 2020 presidential election.

Pls.' Appl. Prelim. Inj., ECF No. 14. To the extent the Court deems that certain aspects of the proposed preliminary injunction are inappropriate, the Court has the authority to adjust the requested relief as it deems fit. *See Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) ("It is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief . . . ."). Although Plaintiffs have alleged that they are at risk of potential disenfranchisement in the November election due to the entirety of the June and July USPS Postal Policy Changes, the

Court finds that Plaintiffs have provided supporting evidence regarding only some of those policy changes.

The Court shall grant Plaintiffs' request to "restore overtime pay" and to "make all late mail deliveries instead of letting mail be delayed or go undelivered." As described above, the Court finds that Plaintiffs have established that, without a preliminary injunction, Plaintiffs are likely to suffer harms based upon this specific conduct.

However, the Court declines to issue a preliminary injunction to "return postal service to that in place on January 1, 2020." Plaintiffs have alleged that USPS policy changes implemented in June and July 2020 have led to significant delays in the on-time delivery of mail, and the Court therefore sees no reason to order USPS to return its operations to the status quo a full six months prior to those changes. In addition, the Court finds that Plaintiffs have submitted little to no evidence connecting the removal of high-speed sorting machines and mailboxes to any resulting delays in mail service. Plaintiffs also have not provided sufficient evidence to warrant a Court order regarding their request to "restore seasoned employees to their former positions" and "lift the hiring freeze." Finally, the Court denies Plaintiffs' request with regard to Defendants "refrain[ing] from any and all other conduct that is intended to interfere and/or interferes with Plaintiffs' fundamental right

to vote in United States elections, including but not limited to the 2020 presidential election" as overly broad and lacking the specificity required by Federal Rule of Civil Procedure 65. *See* Fed. R. Civ. P. 65(d) (providing that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required").

The Court also finds it inappropriate to appoint a special master to supervise implementation of this Court's Order. While Plaintiffs cite to *National Organization for Reform of Marijuana Laws v. Mullen*, 112 F.R.D. 120 (N.D. Cal. 1996) [hereinafter "*NORML*"], in support of their position, the case is readily distinguishable. In *NORML*, the court had already issued a preliminary injunction, and the plaintiffs had subsequently alleged "numerous instances of violations" of that injunction. 112 F.R.D. at 121. The court found that because "[s]uch evidence of noncompliance with an injunction that first issued nearly a year earlier portends continuing violations, especially when viewed in light of the fast-paced and wide-ranging character of CAMP surveillance and raid activities, the difficult legal issues involved, and the numerous affirmative measures that the Court has ordered defendants to undertake" the "circumstances constitute an 'exceptional condition' and call for the appointment of a Special Master." *Id.* Here, in contrast, there

49

is no history of Defendants failing to comply with Court orders, no difficult legal issues involved, and relatively few measures for Defendants to take. Because reference to a master shall be the exception and not the rule, Fed. R. Civ. P. 53(a), the Court finds that implementation of its Order is not so complex as to constitute such exceptional circumstances.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Plaintiffs' motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **October 8, 2020**