# Exhibit B

```
                                                              Page 1
 1
 2   UNITED STATES DISTRICT COURT
 3   FOR THE DISTRICT OF COLUMBIA
 4   ------------------------------------------- x
     STATE OF NEW YORK, et. al.,
 5
                         Plaintiffs,
 6
              -against-
 7
     DONALD J. TRUMP, in his official capacity as
 8   President of the United States, et al.,
 9                      Defendants.
10   ------------------------------------------- x
11
12
13              October 15, 2020
                8:32 a.m.
14
15
16
17
18       VIRTUAL ZOOM DEPOSITION of ROBERT
19   CINTRON, taken pursuant to Notice, held via
20   Zoom before Fran Insley, a Notary Public of the
21   States of New York and New Jersey.
22
23
24
25
```

Page 2

```
 1
 2  A P P E A R A N C E S:
 3    BURGESS, BERG & ANDROPHY
 4        Attorneys for Plaintiffs in
          Richardson v Trump Case
 5
          120 West 45th Street, 38th Floor
 6        New York, New York 10036
 7    BY:  EMILY BURGESS, ESQ.
          Phone: (646) 766-0080
 8        eburgess@bafirm.com
 9
10    NJ OFFICE OF THE ATTORNEY GENERAL
11        Attorneys for Defendants
12        P.O. BOX 112
          Trenton, New Jersey 08625-0112
13
      BY: ESTELLE A. BRONSTEIN, ESQ.
14         -and-
          MELISSA MEDOWAY, ESQUIRE
15        Phone: (609) 292-4925
          estelle.bronstein@law.njoag.gov
16
17    STATE OF NEW YORK, OFFICE OF THE
      ATTORNEY GENERAL
18
19        28 Liberty Street
          New York, New York 10028
20
      BY:  MORENIKE FAJANA, ESQ.
21         -and-
          ALEX FINKELSTEIN, ESQ.
22         -and-
          MATTHEW COLANGELO, ESQ.
23         -and-
          DANIELA NOGUERIA, ESQ.
24        Phone: (212) 453-0786
          morenike.fajana@ag.ny.gov
25
```

Page 3

```
 1
 2  APPEARANCES CONT'D:
 3   ATTORNEY COMMERCIAL AND APPELLATE
     LITIGATION
 4
         Attorneys for United States
 5       Postal Service
 6       475 L'Enfant Plaza, SW
         Washington, DC 20260
 7
      BY:  WENDY A. HARRIS, ESQ.
 8         -and-
         ALICE COVINGTON, ESQ.
 9         -and-
         STEPHAN J. BOARDMAN, ESQ.
10       Phone: (202) 268-8515
         wendy.a.harris@usps.gov
11
12   COVINGTON & BURLING, LLP
13
         Attorneys for Plaintiffs Vote
14       Forward v. DeJoy
15
         The New York Times Building
16       620 Eighth Avenue
         New York, New York 10018-1405
17
      BY:  HABIN CHUNG, ESQ.
18       Phone: (212) 841-1247
         hchung@cov.com
19
20   U.S. DEPARTMENT OF JUSTICE, CIVIL
     DIVISION
21
         Attorneys for Defendants
22
         1100 L Street NW
23       Washington, D.C. 20005
24    BY:  ALEXIS J. ECHOLS, ESQ.
         Phone: (202) 514-5108
25       alex.j.echols@usdoj.gov
```

Page 4

```
 1
 2  -------------- I N D E X ------------------
 3  WITNESS       EXAMINATION BY       PAGE
 4  ROBERT CINTRON   MS. FAJANA         5
 5                   MS. CHUNG        161
 6  -------------E X H I B I T S----------------
 7  CINTRON       DESCRIPTION          PAGE
 8  Exhibit 1  PLAINTIFF'S NOTICE OF
               DEPOSITION              12
 9
10  Exhibit 2  POSTAL SERVICES JULY 2020
               GUIDANCE ON ADHERING TO
11             TRANSPORTATION SERVICES  44
12  Exhibit 3  COURT DOCUMENT           72
13  Exhibit 4  ORDER                    73
14  Exhibit 5  CLARIFYING OPERATIONAL
               INSTRUCTIONS             77
15
16  Exhibit 6  MANDATORY STANDARD-UPTALK 85
17  Exhibit 7  ADDITIONAL RESOURCES FOR
               ELECTION MAIL            96
18
19  Exhibit 8  NUMBER OF POSTAL LATE TRIPS  119
20  Exhibit 9  NUMBER OF EXTRA TRIPS    124
21  Exhibit 10 SERVICE PERFORMANCE DATASET  129
22  Exhibit 11 EXCEL SHEET              162
23       (Exhibits retained by Ms. Fajana.)
24
25
```

Page 5

```
 1              Cintron - Fajana
 2  R O B E R T   C I N T R O N,
 3     having been first duly sworn by the
 4     Notary Public, was examined and
 5     testified as follows:
 6  EXAMINATION BY MS. FAJANA:
 7     Q.   Good morning.  We are now on the
 8  record.  Today is October 15, 2020 and the time
 9  right now is 8:32 a.m.
10          Can the witness please state your
11  name and work address?
12     A.   My name is Robert Cintron.  The
13  address is 475 L'Enfant Plaza, Washington, D.C.
14     Q.   Thank you.  My name is Morenike
15  Fajana.  I work for the New York State of the
16  Attorney General.  My office represents the
17  State of New York in New York v. Trump
18  20-CV-2340 in the District Court for the
19  District of Columbia.  We also have counsel
20  from my office participating in person and by
21  video.  Can other counsel for the State of New
22  York please announce themselves?
23          MR. COLANGELO:  Good morning.
24  Matthew Colangelo from the New York
25  Attorney General's office.
```

Page 10

1            Cintron - Fajana
2     A.   I did.
3     Q.   For how long?
4     A.   I don't know.  Maybe an hour before
5  this deposition.
6     Q.   And was anyone else present during
7  that meeting?
8     A.   Just attorneys.
9          MS. FAJANA:  Counsel, to the extent
10     that Mr. Cintron reviewed documents that
11     have not already been produced, I would
12     ask that they be produced to plaintiff's
13     counsel.
14         MS. ECHOLS:  Okay.
15    Q.   Mr. Cintron, other than your
16  attorneys, have you spoken with anyone else as
17  preparation for today's deposition?
18    A.   No.
19    Q.   All right.  And are you taking any
20  medications or do you have any condition that
21  could prevent you from giving full, complete,
22  and truthful answers to my questions today?
23    A.   No.
24    Q.   Is there any other reason why you
25  could not provide your best and most accurate

Page 11

1            Cintron - Fajana
2  testimony today?
3     A.   No.
4     Q.   Mr. Cintron, do you have any
5  questions for me before we proceed?
6     A.   I do not.
7     Q.   So do you understand that you are
8  being deposed today as part of a lawsuit that
9  the State of New York and other localities
10  filed against the United States Postal Service
11  and other defendants?
12    A.   Yes.
13    Q.   Do you understand that you are also
14  being deposed as part of a lawsuit that Vote
15  Forward and other plaintiffs filed against the
16  United States Postal Service and other
17  defendants?
18    A.   Yes.
19    Q.   What do you understand these
20  lawsuits to be about?
21    A.   Generally, about the slowing of mail
22  that might impact the elections, the
23  initiatives that have been in place over the
24  last several months that could also impact
25  those elections.

Page 12

1            Cintron - Fajana
2         MS. FAJANA:  Alex, could you please
3     display Tab 1.  Can we please mark this as
4     Exhibit 1.
5         (Whereupon document was marked
6     Exhibit 1 for identification as of this
7     date.)
8     Q.   Mr. Cintron, are you able to view
9  this document?
10    A.   I am.
11        MS. FAJANA:  Alex, can you please
12    scroll through so that the witness can
13    review the entire document?
14    A.   (Witness reviewing document.)
15    Q.   Mr. Cintron, are you familiar with
16  this document?
17    A.   Yes.
18    Q.   Have you seen it before?
19    A.   Yes.
20    Q.   When was the last time you saw it?
21    A.   Yesterday, today.  I looked at a
22  few.  Like I said, looked at a few documents.
23  This, I probably would have seen yesterday.
24    Q.   Okay.
25        MS. FAJANA:  Alex, can you please

Page 13

1            Cintron - Fajana
2     turn to page 3 so that we can take a look
3     at topic number 2.
4     Q.   All right.  So turning to topic 2.
5  Per an agreement with your attorneys, I will be
6  asking you questions in your capacity as a
7  30(b)(6) witness on topic 2.  Are you prepared
8  to discuss topic 2 today?
9     A.   Sure, yes.
10        MS. FAJANA:  Alex, can you please
11    display Tab 2.  Actually, Alex, can you
12    take down Tab 2.
13    Q.   All right.  So, Mr. Cintron,
14  although today's deposition is a hybrid,
15  30(b)(6) and 30(b)(1) deposition, I will be
16  asking you questions in your capacity as a
17  30(b)(6) witness, meaning as a witness on
18  behalf of the Postal Service unless I otherwise
19  state.  Is that understood?
20    A.   Yes.
21    Q.   So, Mr. Cintron, how does the Postal
22  Service define transportation schedules?
23    A.   We have a set of schedules that are
24  determined based on operating plans.  So there
25  is a lot of different transportation schedules.

Page 22

Cintron - Fajana

something operating outside the operating plant over and above what transportation changes would be. This would be more around changes that we are making to an actual schedule for some -- some reason, either we are optimizing something or a minor change that would have occurred.

Q. Okay. So you mentioned adhering to transportation schedules. So has the Postal Service ever issued any guidance about the need to adhere to transportation schedules?

A. I would say over the last two years it's kind of been a focal point of mine in my previous job and now in this position. We had many, what I would call initiatives with -- back then, what were the seven areas. So via what I would call were Area Vice President telecoms where I would -- I would be presenting initiatives that we were working on.

It's been my area of focus both for lates and extras in the network over the last couple of years. In terms of something official, different than if you're referencing the, you know, July documents that, from my

Page 23

Cintron - Fajana

perspective, it's the first time we've issued something like that, but there is certainly been focus around the elimination of unnecessary lates and extras.

Q. Just to ask a follow-up question, when you say "area telecon," is that teleconferences with area vice presidents?

A. Yes.

Q. And so over the last two years you had -- how many conferences would you say that you had where you made a presentation about late and extra trips?

A. Good question. Over the last two years, I don't know, might be -- I would be guessing. I'd say roughly seven or eight times we met monthly. So just depending on what the subject was that we were focusing on that month, but I probably would say six to seven times is probably a good -- good number, maybe.

Q. And who participated in developing those presentations with you?

A. I would, my staff. There'd be people on my staff that would develop those -- those slides.

Page 24

Cintron - Fajana

Q. Do you recall what the substance was of any of those presentations?

A. As it related to lates and extras?

Q. Yes.

A. Yes. It would have been around -- it would have been area performance, so it would have been reflecting a number of lates that they would have been running. It would have reflected the amount of extras they were running, cost. It could have had items like surface impacts as a result of running them, so those types of items would have been -- would have been in presentations and discussions with the Area Vice Presidents.

Q. And how did you obtain that information regarding the number of lates and extras in different areas?

A. We use our systems, our transportation systems. So we scan mail. We record. So we know when -- you know, we know what a schedule is. Again, schedules don't change or they are prescribed in the system.

When somebody scans a trailer -- and an example, we scan every trailer that departs

Page 25

Cintron - Fajana

the facility. So if it was scheduled to leave at 3:00 o'clock and it departed at 3:15, then -- then it's late, and that's how we would know. If there is a truck that is running in the system that is not scheduled to run and it's extra service, then it would be flagged as -- as running as an extra truck down the road.

Q. And are there any separate tracking protocols for lates and extras, or how do you actually access that information from the system?

A. I'm not the techy guy, but I mean, we pull it out of the system. So again, they're -- they're flagged in our transportation system, so we just know the difference between an extra or -- or regularly scheduled transportation. So we have a group of analytical folks that would generate that data.

Q. And was there any other data that you reviewed as you prepared these presentations at the AVP Telecons about lates and extras?

7 (Pages 22 - 25)

Page 74

Cintron - Fajana

you familiar with this document?
    A.   I don't know if I've actually seen the document itself. I'm not positive. I looked at too many.
    Q.   Do you otherwise know what this document is?
    A.   Yes. I mean, if you scroll again, it looks like it's the ordering -- go back there. You went a little too fast. Just enforcing the postal policy changes.
    Q.   Do you know whether any changes were made to the Cintron guidelines following the issuance of this order?
    A.   No, because the guidelines again, permitted you to run extra and late service, so we did not want to impact or create confusion, right. So the guidelines tell you to run extras and lates.
    Q.   Okay. So since the date that this order was issued, has the Postal Service given any additional guidance regarding the Cintron or Cintron, excuse me, guidelines?
    A.   That I'm aware of, Cintron guidelines, no, because again, the guidelines

Page 75

Cintron - Fajana

are telling you to run extras and lates. So as it relates to making sure that, to the extent possible, there was no -- you know, overtime is not restricted, late trips and extras have never been banned, right, we made that clear to the organization. They've never been banned. We do it. We've been doing it. We still do it today. The guidelines do not stop you from running extras or lates. You know the same with the overtime. The same with any kind of closures. The same with -- you know, in fact, as it related to transportation, you know, one of the things we said again, we're -- we're going to run extra service in order to make sure that there are no impacts to election mail. So again, the guidelines, we don't believe are in conflict with this as they are telling to run the extra service. It actually preserves to make sure that we do not have service disruption.
    Q.   And when you say you made that clear to employees, how did you make that clear?
    A.   I'm not sure I understand the "made clear."

Page 76

Cintron - Fajana

    Q.   When -- you said you made that clear that late trips and extra trips were not banned, and how did you make that clear to employees or how was that made clear?
    A.   Yeah. Memos have come out that, you know, that say that, that we have not -- not banned the use of extras and lates.
    Q.   Do you recall the date that any particular memo was released?
    A.   You could produce them. I don't -- I mean, right off the top, I don't know -- I wouldn't know the dates.
    Q.   Do you know the substance of any particular memo that was issued regarding the ability of postal employees to continue running lates and extras?
    A.   Again, I think what we've said in different documents again that we have not banned the use of lates and extra service. Those decisions again, made at the front-line level when appropriate to do so.
    Q.   So it's fair to say then that the Cintron guidelines remain in effect at the Postal Service?

Page 77

Cintron - Fajana

    A.   They do.
         MS. ECHOLS: Objection, vague. Go ahead. You can answer.
    A.   They do. They are in effect.
    Q.   Okay.
         MS. FAJANA: Alex, could you please display Tab 7. Let's mark this as Exhibit 5. Can you please scroll through for the witness?
         (Whereupon document was marked Exhibit 5 for identification as of this date.)
    A.   (Witness reviewing document.)
    Q.   Mr. Cintron, are you familiar with this document?
    A.   Yes, it looks familiar.
    Q.   Have you seen it before?
    A.   I have.
    Q.   And when is the last time that you saw this document?
    A.   I don't recollect the last time I looked at it. It came out in September. I'm not sure the last time I would have looked at it.

20 (Pages 74 - 77)

Page 90

1        Cintron - Fajana
2  decisions on an every day basis.  The
3  guidelines are there to help them out if there
4  is any confusion as to when you should do it.
5      Q.   To be clear, what I'm asking is how
6  supervisors and managers understand what terms
7  mean in Postal Service memoranda and guidance.
8  So I'm not trying to -- I don't know what they
9  mean because it's just not clear to me, so I'm
10 trying to understand what other resources,
11 managers, and supervisors may use in order to
12 define some of the terms here.
13     A.   I would say, generally speaking,
14 most of it is experience.  We have a lot of
15 managers that have been in this organization
16 doing their jobs for a very long time.  They
17 truly understand service standards, service
18 commitments, operating plans, transportation
19 schedules and the impact of decisions we make
20 every day.
21          And so I would say that again,
22 they're -- it's not like there is this other --
23 I'm not -- I'm not sure that there are people
24 that are trying to interpret this any different
25 than what -- that what's it meant to do.  We've

Page 91

1        Cintron - Fajana
2  got them running very large facilities and
3  operations in the field and I think that they
4  understand -- they would understand what this
5  is telling them.
6          I think that's why it starts out
7  with the idea that we have not banned them.  So
8  we are not telling them we're not -- we're not
9  telling you don't run them.  We are.  But it's
10 got to be reasonable to able to make timely
11 delivery.  There's just some decisions you --
12 you're just not going to make and we count on
13 those people having some business acumen that
14 allows them to understand the difference of
15 when you do and don't do that.
16     Q.   So if managers and supervisors, you
17 know, rely on their individual experience and
18 expertise to determine whether late trips or
19 extra trips are necessary, then why were the
20 Cintron guidelines issued?
21     A.   Because in some cases people made
22 decisions that were not -- that did not make
23 sense, right.  So that's why I said we have not
24 rescinded the guidelines.  There are reasons
25 why you would not run an extra.  There are many

Page 92

1        Cintron - Fajana
2  reasons that you would.  The guidelines serve
3  as a purpose to try to clarify if there is any
4  confusion.
5          Again, we're -- it makes absolutely
6  no operational sense for us to run a truck at
7  3:00 o'clock in the morning to pick up mail
8  that we can do nothing with until the next day,
9  and we have a piece of transportation that is
10 going to run behind it to pick it up.  It's not
11 going to cost the organization money, that
12 would be a good, smart operational decision to
13 make.
14          And so as I -- you know, again, I'm
15 generalizing that we have a lot of talent in
16 the organization, and there is certainly going
17 to be places where we've got somebody who is
18 maybe newer at her job who needs to take a look
19 at the guidelines to understand because they
20 may not know that decision.  So we didn't pull
21 those out because again, they authorized them
22 to do it but it helps to clarify if there is
23 any confusion when I should or not do
24 something.
25          And again, understand that these

Page 93

1        Cintron - Fajana
2  folks in a lot of cases are not making these
3  decisions on their own.  You know, we have a
4  whole plant that is running.  It could very
5  well be in a plant that they're asking for
6  guidance from their -- from their manager, a
7  co-fellow supervisor, they are calling the down
8  stream Post Master.  There is a lot of activity
9  that happens in an operation that runs 24/7.
10     Q.   So you mentioned some confusion
11 earlier, and I just want to be clear on who was
12 confused at the time before the Cintron
13 guidelines were issued.
14     A.   The only confusion I'm aware of are
15 the people that I mentioned before, and when I
16 say "confusion," I don't know if that was the
17 best word.  They wanted clarity.  So we went to
18 a presentation.  The presentation said no
19 lates.  That's not what we meant.  In fact,
20 five of the Area Vice Presidents never called
21 me.  It's clear to them, but we had a couple
22 that had questions.  What does -- you know,
23 what does it mean for this?  So are you saying
24 we can't pick up mail from THS?  No, no, that's
25 not what we said.

Page 118

Cintron - Fajana

a schedule. What our focus has been is we would much rather that we take the failure there, the 10 percent, at that point in time, than to try -- again, these are heroic efforts.

The people at the Postal Service, they are very focused. Again, and this has been a long-aged issue with our people, right. They are trying to get every piece every day. So they want to get every piece on the truck and don't always understand that the truck, when it gets to its destination where it's going, may not making it there timely and now you're bringing the mail back. That is why we need to run on a plan. The truck would have left at 90 percent. It would have made the air stop. And yeah, we would have had some delayed mail. We would have had some. It would have been a small pile sitting in the plant. We held it a little too long and then it got refused. Those are real scenarios that have been happening every day for a very long time. So our focus is to reduce that from happening.

MS. FAJANA: Fran, can we take a ten minute break, please. We will be back at

Page 119

Cintron - Fajana

11:12.

(Time noted: 11:02 a.m.)
(Brief recess taken.)
(Time noted: 11:13 a.m.)

MS. FAJANA: Can we please go back on the record, Fran. Alex, can you please display tab 12 and we can mark this as Exhibit 8.

(Whereupon document was marked Exhibit 8 for identification as of this date.)

BY MS. FAJANA:

Q. Mr. Cintron, are you familiar with this document?

A. Yes.

Q. When was the last time that you saw this document?

A. I think this particular one might have been a few days ago, maybe Monday.

Q. What does this document show?

A. This is the number of postal late trips that occurred between March 1st and October 11th and it's by week and so it shows number of late trips it ran and the percent

Page 120

Cintron - Fajana

load.

Q. What does percent load mean here?

A. That would be the amount of -- it equates a number of containers that are on the trailer so if we can get 24 containers on a truck and we have 12, it's a 50 percent load.

Q. How does that relate to the number of late trips?

A. It's just tracking based on those late trips what that percent load was on them. I'm not sure what you mean by how does it relate. It's only that percentage for those particular trips it ran that week.

Q. Okay, understood.

MS. FAJANA: Alex, can we turn to the last page, please. Can we scroll down to the bottom?

Q. So this reflects late trips for the past few weeks. It appears to be the most recent data available based on what is in this document. I think you mentioned already that we have data up until October 11th; is that correct?

A. Yes.

Page 121

Cintron - Fajana

Q. How many late trips were taken on October 11th based on this document?

A. It would have been for the week 7/14. So what is today's date? So the 11th, our week starts, so that would have been through Sunday morning, starting Sunday morning -- no, actually, it's by day, not by week. This is by day. So 7/14 on the 11th, Sunday.

Q. Sunday, okay. So let's look at just the month of October more generally. If you could just take a look from October 1st through October 10th?

A. Yep.

Q. And on average, how many late trips were taken per day in October 2020?

A. I mean on average I don't know. 1,700.

Q. I think we can say just between 1,000 and 2,000, right, based on the variation; is that accurate to say?

A. Sure.

Q. Now, let's look at late trip data for earlier in the year. So can you please

Page 122

1            Cintron - Fajana
2  scroll up to the June 1st row.  So let's take a
3  look at just June 1st through June 17th.
4  That's what is displayed on my screen and how
5  many late trips were taken on average during
6  this time period in the first half of June?
7      A.   Four to 5,000.
8           MS. FAJANA:  Alex, can we now look
9      at the second half of June.  So June 16th
10     or 17th through the 30th.
11     Q.   What about for this time period in
12 the second half of June; how many late trips
13 are there on average?
14     A.   I mean on average it looks to still
15 be around 4,000.
16     Q.   So is it correct that there are
17 fewer late trips per day happening in October
18 as compared to per day in June of this year?
19     A.   Sure.
20     Q.   So now, let's move on to July and
21 Alex, can we take a look at the 1st of July
22 through the 10th.
23          So just up until July 10th, how many
24 late trips are there on average per day during
25 the time period from July 1st to July 10th?

Page 123

1            Cintron - Fajana
2      A.   It appears to be 48, 4,900.
3      Q.   So since there is some variation,
4  would it be fair to say that it's between 3 to
5  5,000 as well in early July?
6      A.   Sure.
7      Q.   Is it also correct that there are
8  fewer late trips per day now in October as
9  compared to early July?
10     A.   Yes.
11     Q.   So now, let's look at -- starting
12 July 11th and look at the next couple of weeks.
13 So for the remainder of July.  So if we could
14 scroll through and also look up until
15 July 31st.
16          So how would you characterize the
17 number of late trips happening at this time
18 from July 11th through July 31st?
19     A.   1,000 to 1,800.
20     Q.   Is it correct to say that that is
21 around the same rate as of right now in
22 mid-October?
23     A.   I believe it was.
24     Q.   Is it fair to say that the rate of
25 late trips is significantly lower than it was

Page 124

1            Cintron - Fajana
2  before July 11, 2020?
3      A.   Absolutely.
4           MS. FAJANA:  Alex, can we please
5      look at tab 11 and we will mark this as
6      Exhibit 9.
7           (Whereupon document was marked
8      Exhibit 9 for identification as of this
9      date.)
10     Q.   Mr. Cintron, are you familiar with
11 this document?
12     A.   Yes, that would be extras.
13     Q.   Have you seen this document before?
14     A.   I have.
15     Q.   When did you last see it?
16     A.   I would say in the last few days,
17 maybe Monday.
18          MS. FAJANA:  Alex, can we please
19     scroll through to the bottom.
20     Q.   So looking at this time period
21 again, the data that we have from October, so
22 that's October 1st through October 11, 2020, on
23 average how many extra trips were being made
24 during this time period?
25     A.   October looks like 500 to 1,700.

Page 125

1            Cintron - Fajana
2      Q.   So let's look at just October 1st
3  through October 10th.
4      A.   Okay.
5      Q.   And it seems like -- what would you
6  say the average was there if we look at just
7  the 1st through the 10th?
8      A.   Five to 700.
9      Q.   So what accounts for this jump on
10 October 11 in the number of extra trips?
11     A.   Holiday.
12     Q.   Which holiday?
13     A.   Columbus Day.
14     Q.   How does the Columbus Day holiday
15 relate to the number of extra trips?
16     A.   Usually around holidays we got a big
17 push.  We certainly did this holiday in terms
18 of getting prepared and cleaned up, heading
19 into one of the busiest weeks for us.  So we
20 would have authorized a lot of extras.  There
21 was a lot of extra planning.
22          We ran operations on Sunday and
23 Monday.  So there would have been a lot of
24 transportation wrapped around that.  We would
25 have seen that same escalation on the whole

Page 126

Cintron - Fajana

weekend. I think we may have run as many as 1,800 trips on the 12th.
Q. 1,800 extra trips?
A. Yes.
Q. So can we take a look at the data for September. So if we could scroll through?
A. Okay.
Q. What would you say is the average rate of extra trips in September?
A. Is there a certain range you want me to pick? I mean it looks to be somewhere between five and 700.
Q. So is that around the same range as October?
A. I mean if I exclude those other days, yes.
Q. If you exclude the days where there were increased extra trips due to the Columbus Day holiday?
A. Right. Volumes pick up in October. So yeah, we are starting to see that escalation now.
    MS. FAJANA: So, Alex, can we scroll to June. So that should be midway through

Page 127

Cintron - Fajana

this document. If you could just -- if we could maybe slowly scroll through to the 30th of June.
Q. Mr. Cintron, what would you say is the average rate of extra trips per day from June 2020?
A. It looks like 21 to 2,400.
Q. Now, let's keep going and let's look at early July, July 1st through July 10th. Is that rate about the same as it was in June?
A. Through July 10th, yeah, maybe, I guess. It's 1,900 to 2,300.
Q. So is it correct that there are fewer extra trips now as compared to the month of June and the first half of July?
A. Yes.
Q. So now, let's keep going and look later in July, starting from the 10th and going through the rest of the month. What would you say the rate is for the rest of July, so starting with July 11th for extra trips on average per day?
A. Five to 700.
    MS. FAJANA: Alex, you can take this

Page 128

Cintron - Fajana

tab down. Thank you.
Q. So we spoke earlier about service standards and I just wanted to ask a few follow-up questions about that, service performance rather and impact on service.
    So what are the current service performance goals for first class mail?
A. We would have some different, depending on the actual class that you are looking for. The particular service standard, there would be different goals if that's what you are asking for the service standard itself?
Q. Yes, the service standard.
A. Yes, first class overall would be 96.
Q. And then you said 96/5?
A. That could be for two day mail, first class, or two day overnight, three to five day. They all have a different target.
Q. So what is the standard for two day?
A. Two day would be 96/5.
Q. What would be the standard for three day to five day?
A. 95/2.

Page 129

Cintron - Fajana

    MS. FAJANA: Alex, can you please display tab 13 and we will mark this as Exhibit 10.
    (Whereupon document was marked Exhibit 10 for identification as of this date.)
Q. Mr. Cintron, are you familiar with this document?
A. I am.
Q. Have you seen it before?
A. Sometime in the last several weeks, yes.
    MS. FAJANA: Actually, Alex, can you scroll down so we can see the last row on this page?
Q. So do you know when you last saw this particular dataset that has data through the week beginning September 26, 2020?
A. I couldn't tell you definitive. I have seen this document a couple of times, so I don't know the last time for this particular one. It would have been in the last couple of weeks.
Q. What does this document show?

33 (Pages 126 - 129)

Page 130

Cintron - Fajana

2  A.  Got rid of the headers, you don't
3  need to go there, but basically it's showing
4  the by week scores for market documents, which
5  is first class mail, US marketing mail and
6  periodicals.
7  Q.  What do the scores show?
8  A.  The service performance of that
9  particular product.
10  Q.  So looking at the column that says
11  first class mail, is it fair to say that the
12  score reflects the rate at which the postal
13  service delivers first class mail on time?
14  A.  91.76 against the standard, yes, on
15  time.
16  Q.  Against the standard of?
17  A.  The service score would be
18  91.76 percent for first class mail.
19  Q.  So looking at that row for first
20  class mail, what does that mean in relation to
21  the service standards that we were just
22  discussing?
23  A.  I mean overall it means that
24  8.24 percent of the mail was delivered later
25  than the expected standard.

Page 131

Cintron - Fajana

2      MS. CHUNG:  Can we go off the record
3      for a minute?
4      MS. FAJANA:  Fran, yes, let's go off
5      the record.
6      (Time noted:  11:33 a.m.)
7      (Brief recess taken.)
8      (Time noted:  11:35 a.m.)
9      MS. FAJANA:  Can we go back on the
10     record please, Fran.
11     Can we, Alex, can you please scroll
12     to the bottom so we can see the last
13     several rows in this document which
14     reflects service scores for the past
15     several weeks; is that correct,
16     Mr. Cintron?
17     THE WITNESS:  Yes.
18 BY MS. FAJANA:
19  Q.  Just to be clear, my understanding
20 is that this data for the last row reflects
21 mail delivered from September 26th through the
22 following Friday; is that correct?
23  A.  I'll just validate that date, but
24 yes, we run our week from Saturday to Friday.
25  Q.  Just looking at the calendar,

Page 132

Cintron - Fajana

2 Saturday was September 26th, so that would be
3 through October 2nd?
4  A.  That's correct.
5      MS. FAJANA:  Could we just scroll up
6      a little bit, Alex, so we could see the
7      last row as well.  Sorry, scroll down
8      because its cut off on my screen for some
9      reason.  That's great.  Thank you.
10  Q.  So let's take a look at the scores
11 for the past few weeks.  Just looking at first
12 class mail, which is the first column, so what
13 was the service performance score for the week
14 beginning September 5th?
15  A.  88.74.
16  Q.  And the week beginning
17 September 12th?
18  A.  86.75.
19  Q.  The week beginning September 19th?
20  A.  84.23.
21  Q.  And the final week beginning
22 September 26th?
23  A.  85.97.
24  Q.  So is it correct to say that these
25 service scores for the month of September have

Page 133

Cintron - Fajana

2 remained below the Postal Service standard for
3 first class mail?
4  A.  Yes, it would be fair to say the
5 whole year was underneath the service standard.
6  Q.  I'm just asking about the last four
7 weeks of September.
8  A.  Yes.
9  Q.  Let's scroll up and take a look at
10 scores from January to June.  Right here we
11 have scores from the week starting January 4th
12 through the week of May 30, 2020.
13     Is it accurate that the scores for
14 September are lower on average than the scores
15 here for the first five months of the year?
16  A.  On average, yes.
17     MS. FAJANA:  So, Alex, can we scroll
18     down and look at the month of June as
19     well.
20  Q.  So just looking at the month of
21 June, those four weeks, is it fair to say that
22 scores in September were also lower than
23 service scores for the month of June?
24  A.  Yes.  You are just asking for first
25 class, right?

Page 158

Cintron - Fajana

1
2  Q.  So, Mr. Cintron, have you taken any
3  steps to ensure compliance with the Order that
4  was issued in our case?
5      MS. ECHOLS:  I'm going to object to
6  the extent that this calls for Mr. Cintron
7  to disclose any conversations he's had
8  with counsel regarding this or any other
9  legal matter related to this injunction or
10  other injunctions.
11  Q.  You can answer.
12      MS. ECHOLS:  Or to the extent that
13  it also may disclose any deliberative
14  process.  Go ahead, Mr. Cintron.
15  A.  Other than again through my own
16  organization, any communications we would have
17  pushed down as part of a stand-up talk that
18  would have gone out to the organization, we
19  would have pushed that down through again the
20  whole organization which would have included
21  any of my folks around any of these items.
22      So if that's what you are asking,
23  then to that extent I would say yes.
24  Q.  I think I'm not quite clear on your
25  answer because you're speaking in a

Page 159

Cintron - Fajana

1
2  conditional.  So did you take any steps to
3  ensure compliance with this Order that was
4  issued in this specific case?
5  A.  I didn't see --
6      MS. ECHOLS:  Note my objection.  Go
7  ahead.
8  A.  I did not -- again, maybe I'm
9  confusing your question.  I did not see
10  anything here that we did not ban late trips
11  and extras which would have been in my area of
12  responsibility.  We did not do that and as
13  such, there wasn't anything to change.  We are
14  not banning them.  We run them every day.  We
15  run them every day to day.
16  Q.  Okay, understood.
17      MS. FAJANA:  Fran, can we please
18  take a short five minute break.
19      (Time noted:  12:57 p.m.)
20      (Brief recess taken.)
21      (Time noted:  1:04 p.m.)
22      MS. FAJANA:  Fran, can we go back on
23  the record, please.
24      So that concludes the questioning on
25  behalf of the plaintiffs in the New York v

Page 160

Cintron - Fajana

1
2  Trump case, but I did want to ask whether
3  plaintiff counsel in either the Vote
4  Forward case or the Richardson case had
5  questions that they also wanted to ask and
6  I would just ask that you designate
7  whether you are asking those questions in
8  Mr. Cintron's capacity as a 30(b)(6)
9  witness or a 30(b)(1)?
10      MS. BURGESS:  This is Emily Burgess
11  for the Richardson plaintiffs.  We don't
12  have any questions.
13      MS. FAJANA:  I believe unless anyone
14  else has further questions, that this will
15  conclude the deposition of Robert Cintron
16  for today.
17      Mr. Cintron, thank you very much for
18  your time today.
19      MS. ECHOLS:  I would like to take a
20  brief break and maybe if we could have,
21  I'll just say five minutes just to check
22  in, make sure we don't have any follow-up.
23      MS. FAJANA:  Well, I think actually
24  that another plaintiff's counsel is
25  prepared to ask a few more questions.

Page 161

Cintron - Fajana

1
2      MS. ECHOLS:  I'm sorry, who is that?
3      MS. CHUNG:  Hello.  This is Habin
4  Chung for Vote Forward.  If I can ask a
5  few questions.  I'm happy to take a break
6  if you would like to take a few moments
7  right now.  I'm happy to do it.
8      MS. ECHOLS:  No, no.  I'm sorry.  I
9  missed the -- I thought the call for more
10  questions was over for both Vote Forward
11  and for Richardson.  Let's go ahead.  I'm
12  sorry.
13      MS. CHUNG:  Of course.
14  EXAMINATION BY MS. CHUNG:
15  Q.  Hello, Mr. Cintron.  I'm Habin
16  Chung.  I'm counsel for Vote Forward.  Thank
17  you for your time again.  I just had a few more
18  questions following up on the questions from
19  the NYAG's office.
20      So after the second most break we
21  had, basically after the lunch break, the
22  counsel from NYAG asked you a series of
23  questions relating to performance scores in
24  your individual capacity so as a 30(b)(1)
25  witness.

41 (Pages 158 - 161)

```
 1
 2
 3        C E R T I F I C A T E
 4        I, FRAN INSLEY, hereby certify that the
 5   Deposition of ROBERT CINTRON was held before me
 6   on the 15th day of October, 2020; that said
 7   witness was duly sworn before the commencement
 8   of testimony; that the testimony was taken
 9   stenographically by myself and then transcribed
10   by myself; that the party was represented by
11   counsel as appears herein;
12        That the within transcript is a true
13   record of the Deposition of said witness;
14        That I am not connected by blood or
15   marriage with any of the parties; that I am not
16   interested directly or indirectly in the
17   outcome of this matter; that I am not in the
18   employ of any of the counsel.
19        IN WITNESS WHEREOF, I have hereunto set
20   my hand this 16th day of October, 2020.
21
22
23   [signature: fran]
24   ------------
25        FRAN INSLEY
```

Page 175

```
 1
 2        VERITEXT LEGAL SOLUTIONS
 3   NAME OF CASE: STATE OF NY v. TRUMP
     DATE OF DEPOSITION: October 15, 2020
 4   NAME OF DEPONENT:  ROBERT CINTRON
 5   PAGE  LINE(S)     CHANGE         REASON
 6   ____|_____|_____|_____
 7   ____|_____|_____|_____
 8   ____|_____|_____|_____
 9   ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20   _____
              ROBERT CINTRON
21   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS___DAY OF _____, 20___.
22
23
24   (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
25
```